## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | |
|---|---|
| Jon Henry Hall, Jr.<br>c/o Pattakos Law Firm<br>101 Ghent Rd.<br>Fairlawn, Ohio 44333<br><br>              Plaintiff,<br>    vs.<br><br>Ofr. Joshua Tanner<br>c/o City of Canton Law Director<br>Jason P. Reese<br>218 Cleveland Ave. SW 7th Floor<br>Canton, OH 44702<br><br>AND<br><br>Ofr. Joseph Bays<br>c/c City of Canton Law Director<br>Jason P. Reese<br>218 Cleveland Ave. SW 7th Floor<br>Canton, OH 44702<br><br>AND<br><br>Sgt. Kyle Slone<br>c/o City of Canton Law Director<br>Jason P. Reese<br>218 Cleveland Ave. SW 7th Floor<br>Canton, OH 44702<br><br>AND<br><br>Chief John Gabbard<br>c/o City of Canton Law Director<br>Jason P. Reese<br>218 Cleveland Ave. SW 7th Floor<br>Canton, OH 44702<br><br><br>City of Canton, Ohio<br>c/o City of Canton Law Director<br>Jason P. Reese<br>218 Cleveland Ave. SW 7th Floor | Case No.<br><br>Judge<br><br>**Complaint With Jury Demand** |

| Canton, OH 44702<br><br><br>Defendants. | |
|---|---|

## I. Introduction

1.      This lawsuit is to remedy damage caused by Defendants' malicious and unconstitutional escalation of an ordinary police call to a baseless Fourth Amendment seizure, use of excessive force, and malicious prosecution of Plaintiff Jon Henry Hall.

2.      Mr. Hall, who suffers from severe and debilitating disabilities substantially limiting his mobility, was harassed by Defendant Josh Tanner who then pretextually arrested Hall while ignoring his obvious disabilities and causing him additional severe physical injuries. Defendant Joseph Bays ignored the egregiously unconstitutional arrest and excessive force deployed by Defendant Tanner and allowed these violations against Hall to proceed without intervention.

3.      To make matters worse, Defendant Kyle Slone then interrogated Mr. Hall and attempted to add his own diagnosis to the one made by Defendant Tanner and wrongly charged Mr. Hall with falsification in order to cover up for Tanner's misdeeds.

4.      Defendant City of Canton either failed to train Defendants Slone and Tanner as effective or competent police officers, or trained and conditioned them to perform their job inadequately and incompetently and as a result they arrested and charged Hall with crimes on the basis of, essentially, nothing but their own prejudices.

5.      Mr. Hall stood trial, was acquitted by the jury due to the plain lack of evidence of any criminal conduct, but nonetheless suffered physical injuries, humiliation, the cost and protracted worry of a prosecution and trial, and the contempt of Defendants Slone and Tanner for his medical conditions.

6.      As alleged herein, Defendants' actions, and the circumstances creating the incentives for these actions, offer a compelling demonstration of the importance of the protections offered by the Constitution and 42 U.S.C. § 1983 against abuses by those entrusted with state power.

7.      In particular, this case illustrates the problematic manifestation of an all-too-common fact pattern that has resulted from the Supreme Court's landmark decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), where it held that putative §1983 plaintiffs are barred from pursuing a remedy for civil-rights abuses, no matter how egregious, if that remedy would imply the invalidity of any criminal conviction, no matter how minor, related thereto. Thus, in any case where egregious police misconduct is at issue, as here, *Heck* incentivizes the responsible officers to trump up baseless criminal charges against the victim—such as for assault, resisting arrest, or disorderly conduct—to insulate themselves from liability, knowing that the average citizen will be less likely to stand a criminal trial to retain the right to pursue their civil claims.

8.      State actors, like Defendants here, who initiate baseless criminal proceedings with the intent to bar the subject of those proceedings from suing to remedy a civil right abuse under *Heck* violate that citizen's fundamental First Amendment right to access the Courts. Defendants Chief Gabbard and City of Canton are herein alleged to have adopted and employed a custom, policy, and practice of depriving such citizens of their First Amendment rights in precisely this manner.

9.      Hall therefore herein asserts claims under 42 U.S.C. § 1983 for Defendants' violations of his First Amendment right to petition federal and state courts for civil relief, and his rights under the Fourth Amendment to be free from excessive force, malicious prosecution, and falsification of evidence against him by state actors.

10.      Mr. Hall also herein asserts claims under Ohio law for malicious prosecution.

## II.  Jurisdiction and Venue

11.     This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for the claims raised under 42 U.S.C. § 1983 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the claims raised under Ohio law.

12.     This Court has jurisdiction over Defendants because they are residents or political subdivisions of the State of Ohio.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts upon which the claims in this litigation are based and the damages resulting therefrom occurred in the City of Canton, Stark County, Ohio.

## III.  Parties

14.     Plaintiff Jon Henry Hall, Jr. is a U.S. Citizen and a resident of the City of Canton in Stark County, Ohio.

15.     Defendant City of Canton is a political subdivision of the State of Ohio, subject to suit under 42 U.S.C. § 1983 and the U.S. Constitution for adopting, supporting, and permitting unconstitutional customs, policies, and practices as alleged herein. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

16.     Defendant Josh Tanner is or was, at all relevant times a police officer in the City of Canton Police Department and performed his job duties and responsibilities in that City.

17.     Defendant Joseph Bays is or was, at all relevant times a police officer in the City of Canton Police Department and performed his job duties and responsibilities in that City.

18.     Defendant Kyle Slone is or was, at all relevant times a police officer in the City of Canton Police Department and performed his job duties and responsibilities in that City.

19.    Defendant John Gabbard is or was, at all relevant times, a police officer in the City of Canton Police Department and performed his job duties and responsibilities in that City, and is the acting Chief of Police and top decision maker and policy maker at the City of Canton regarding Canton Police Department and all employees thereof.

## IV.  Facts

### A.    The events of September 11, 2023 and the baseless criminal charges against Mr. Hall

20.    Plaintiff suffers from complex regional pain syndrome, which causes severe, recurring pain (in his case throughout his body),  and substantially limits his mobility. He is unable to stand unsupported for longer than very brief periods, and cannot walk unassisted for more than a few steps at a time. He requires a walker to be mobile for very short distances and otherwise requires a wheelchair.

21.    On September 11, 2023, Canton Police responded to a call from Jennifer Smith, Mr. Hall's caretaker and girlfriend. She and Mr. Hall have since married.

22.    Ms. Smith alleged on her call that Hall had locked her out of his apartment and that she still had possessions inside which he would not permit her to access, including the keys to her car and home, and her cell phone.

23.    Defendant Josh Tanner arrived shortly after Defendant Bays at the apartment building where Mr. Hall then resided.

24.    Officers spoke to Hall through the door of his apartment. He initially advised them that he could not come to the door immediately. Eventually he spoke to officers through the closed door of his apartment, denying that Smith had property in his home.

25.    The officers found the maintenance supervisor, and brought him to Hall's door, where he made a series of statements and threats alleging that he had the right to enter the premises without

consent. Hall did not consent to this access and the maintenance supervisor did not attempt to enter despite claiming the authority to do so.

26.     Hall, finally able to reach the door due to his mobility issues, opened the door and leaned on the frame while he spoke to officers and Ms. Smith. Throughout his testimony in this case, Defendant Tanner acknowledged that Hall leaned on or against objects and walls when he moved, as reflected by body camera footage from the incident.

27.      Hall continued to deny that Ms. Smith had property in his home, and continued to state that he did not want officers entering the premises. Tanner almost immediately threatened Hall with arrest despite Hall in no way refusing lawful commands (because no commands had been given).

28.     Hall agreed to allow Ms. Smith to enter the premises, and stood aside to let her in. Because he began to close the door after her, Tanner ordered Hall to "open the fucking door right now" and continued to threaten Hall with arrest. Hall repeatedly remarked to Smith that Defendants Tanner and Bays seemed eager to escalate the situation.

29.     Hall stood with the door open while Tanner observed Smith sorting through bags. His disability was apparent as he moved from the door jamb to lean on the door itself, prompting Tanner to instruct him that "if you touch this door one more fucking time it's going to be out of your choice I'm going to come in" at which point Hall moved out of the doorway, frightened and aware of the danger he was in.

30.     At all times in their interactions in his home, Tanner's body camera footage shows Hall leaning on walls and other supports, which Tanner admitted in his trial testimony. Defendant Bays says almost nothing, and takes no action throughout the encounter. Tanner also admitted to never having inquired of Mr. Hall's disability, despite Hall's protestations regarding same, the obvious presence of Hall's wheelchair and walker, and Smith having identified herself as his caregiver.

31.     Smith recovered some items from the apartment, although she later determined that the keys and phone were not actually inside the apartment but had remained in her possession the entire time.

32.     When Hall objected that Smith was attempting to remove property from the premises that was not hers, and followed her to the bathroom objecting, Tanner followed also.

33.     Hall, leaning on the doorframe, gestured with his other arm at Smith inside the bathroom, at which point Tanner grabbed Hall's arm, twisted it behind him, and over Hall's wails of pain, arrested him for assault. Defendant Bays again took no action.

34.     Tanner testified at trial that he did not review his body camera footage before writing up the complaint, in which he stated that Mr. Hall "did grab Jennifer Smith by the arm and the back of the neck and began dragging her out of the bathroom in an attempt to cause harm." Tanner admitted on the stand that "I had not watched the video. . . watching the video I see that he did not grab the arm just the neck." In fact the video did not show even a grabbing of the neck. Tanner testified that "technically" his complaint was therefore false. He also conceded that in his body cam video "you can't see the hand on the neck at the part that you showed me."

35.     Tanner also admitted to ignoring Hall's protestations of pain and disability. When asked if Mr. Hall showed a lack of mobility in his stance, Tanner testified "not in my opinion no" and also that despite multiple mobility aids in the room, including Hall's walker and wheelchair, he "ma[d]e no attempt to get him to" those aids. Tanner, in testimony, acknowledged Hall's audible pleas that he could not walk or comply with Tanner's attempts to remove him from the apartment, as well as his protestations of injury. Defendant Bays continued to do nothing to intervene or halt the arrest.

36.     Only as Defendant Tanner attempted to drag Mr. Hall out of the apartment did Tanner belatedly realize "a long way into the interaction" that Mr. Hall suffered from disabilities and assist him to a wheelchair.

**B. Mr. Hall's report of assault and further baseless criminal charges.**

37.    Hall's arrest by Tanner resulted in injuries for which he went to Cleveland Clinic Mercy Hospital for treatment.

38.    While at the hospital, Hall placed a 911 call to report being assaulted by two men, and a Canton Police officer was dispatched to the hospital to investigate. Upon realizing that Hall was reporting an assault by Canton Police officers Tanner and Bays, Defendant Kyle Slone was called to interview Hall and to investigate his allegations.

39.    Defendant Slone testified that as a Sergeant, he performed typical patrol and law enforcement duties, but also "offer[ed] guidance, input. . .knowledge on policies, procedures, citizen complaints." Hall's report was treated as a citizen complaint, to which Sgt. Slone was dispatched to investigate.

40.    Slone testified that such citizen complaints are taken seriously because "police officers need to be beyond reproach. . . We are held to a higher standard." Defendant Slone also testified that of the complaints that he has investigated, "99% of them" are lies, or, as Slone phrased it, "not representing the truth as to what happened." Defendant Slone also testified that despite this high percentage rate of lying by citizen reporters, he had only ever brought "less than 5" charges of falsification based upon the supposed lies.

41.    Slone testified that he took Hall's statement, which detailed not only his mistreatment and injury by Tanner, but also an explanation of his disabilities that affect his mobility and cause severe recurring pain.

42.    Slone stated that he reviewed the body cam footage after speaking to Hall, and that based on his viewing of that footage, he "completed a separate police report for falsification along with criminal complaints for falsification" because, Slone claimed, Hall had been "lying to me."

43.     Specifically, Slone testified that Hall lied because "he had told me he couldn't walk and that the police mishandled him. . . I didn't see any assault in that body camera of the officers whatsoever. . .he was up and walking." Slone characterized Mr. Hall's statements as "a complete farce."

44.     Defendant Slone testified that the sum total of his investigation of Hall's disabilities and lack of mobility was asking him "you can walk when you want to right?" and that he made no consultation with physicians, nor with his caregiver or other officers.

45.     Based on his interview with Hall, and his review of Tanner's body cam video, Slone "determined that he [Mr. Hall] could walk" and thus decided to file charges against him.

## C. Policy Violations

46.     Slone testified that his role in addressing citizen complaints is, in part to hold officers "to a higher standard" and that his "responsibility" as to Hall's allegations of assault "is to determine whether or not the officers are within policy for our use of force policy." He testified that Tanner had been within that policy.

47.     Officers acknowledged a number of policy violations, however, in the course of their testimony, and Slone's assessment of Tanner's arrest was not borne out.

48.     Tanner, under cross-examination for his arrest of Hall, and specifically his ignoring Hall's protests of pain, was asked directly "can you tell us what the department policy is on making safe arrests" to which he responded "I don't know the policy exactly."

49.     Tanner was also questioned about his department's policy regarding allegations of domestic violence, "isn't it part of your departmental policy to then separate the alleged victim and speak with them further?" Tanner agreed that separation was a policy and that "[he] didn't do that in this case".

50.     Tanner testified unequivocally that he made no inquiry about "why he [Mr. Hall] used the walker" and that he also made no inquiry of Smith, who identified herself as Hall's caregiver on Tanner's body cam video.

51.     Slone, whose job it was to evaluate Tanner's compliance with departmental policies, had so clearly already concluded that Hall was part of the "99%" of complainants who are lying that he was asked, of his interview with Hall "[i]t sounds like at this point you have already made up your mind that there is no, that they are acting within departmental policies, right?" Slone's denials are undercut by his determination, with no evidence of any assault by Hall or of Hall's untruthfulness regarding his mobility, to charge Hall for falsification even though ample evidence of Hall's disabilities was apparent

**52.**     After Smith's testimony, in which she unequivocally testified that Hall in fact is unable to stand or walk unsupported, and that her job as caregiver was to assist him in all aspects of daily living due to his disabilities, and additionally that Hall had not touched her neck or threatened her, as well as Mr. Hall's own testimony about his condition and the facts, the jury acquitted him of all charges.

### V.  Causes of Action

**Count 1**
**Unreasonable Seizure**
**Fourth Amendment and 42 U.S.C. § 1983**
**(against Defendants Tanner, Bays, and Slone)**

53.     Plaintiff incorporates the previous allegations by reference.

54.     This Count 1 is alleged against Defendants Tanner and Slone individually, in their personal capacities.

55.     With purpose and intent, acting under color of law, Defendants Tanner, Bays, and Slone caused the unlawful arrested, detainment, and seizure of Mr. Hall's person. Reasonable officers in the respective positions of these Defendants would not have initiated this seizure. These Defendants seized Hall without probable cause or reasonable need to do so. The unlawful seizure was objectively unreasonable under the Fourth Amendment.

56.     By their actions asserted herein that initiated the unlawful seizures, Defendants Bays, Slone, and Tanner were acting under color of state law, without probable cause to charge Mr. Hall for any crime. Defendant Tanner, after reviewing the video in court, was forced to admit that his initial report was incorrect, and that he did not in fact see, because it did not occur, Mr. Hall grab Ms. Smith's arm or neck. She testified to the same fact. Defendant Slone testified that he reviewed the video and that it justified the use of force by Officer Tanner, despite the video not depicting Ms. Smith being grabbed by Mr. Hall, or even touched. Defendant Bays took no action to intervene against an illegal arrest and deployment of excessive force despite a clearly established duty to do so. *See Bunkley v. City of Detroit*, E.D.Mich. Civil Action No. 16-CV-11593, at *19 (Sep. 12, 2017). ("§ 1983 protects individuals against unlawful arrest and detention. And every circuit has recognized officers' duty to intervene at least in excessive force cases. *See Abrahante v. Johnson*, No. CIV. 07-5701JBS/KMW, 2009 U.S. Dist. LEXIS 59835, 2009 WL 2152249 at *12 (D.N.J. July 14, 2009) (collecting cases from eleven circuits). Thus, the Court must determine whether those protections overlap—i.e., whether there is a clearly established right to intervention in cases of unlawful arrest. Unequivocally, yes. When officers make an arresting decision as a unit and with the permission of their supervising sergeant, applicable case law puts them on notice that their respective failures to intervene to stop an unlawful arrest—i.e., one lacking probable cause—is a constitutional violation. ").

57.      Based on his unsupported and flatly wrong belief that Mr. Hall was fully capable of ordinary mobility, Defendant Slone charged him with falsification despite no false statement having been made.

58.     By their actions alleged herein, Defendants Tanner, Bays, and Slone deprived Hall of his right to freedom from illegal seizure of his person that is secured to him by the Fourth Amendment and was clearly established as of September 11, 2023, causing him to appear in court to defend

against baseless charges, and to suffer deprivation of his liberty while trial was pending. All of these actions caused damage to Hall.

59.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Mr. Hall's rights, he has suffered and will continue to suffer economic and non-economic damages for which Defendants Tanner, Bays, and Slone are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Hall is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 2**
**Excessive force**
**Fourth Amendment and 42 U.S.C. § 1983**
**(against Defendant Tanner and Bays)**

60.     Plaintiff incorporates the previous allegations by reference.

61.     This Count 2 is alleged against Defendants Tanner and Bays individually, in each's personal capacity.

62.     With purpose and intent, acting under color of law, Defendant Tanner used or caused the use of excessive force against Mr. Hall to terrorize him. Even if Defendant's arrest of Mr. Hall was reasonable and lawful (it was not), a reasonable officer would not have used the kind of force that Defendant used to detain him.

63.     Defendant Bays observed Tanner's use of excessive force and unlawful arrest of Mr. Hall, and ignored his clearly established duty to intervene in prevention of same, thus ratifying the unlawful conduct and constitutional violation.

64.     Officer Tanner used a grossly unnecessary amount of force to detain Hall, which is shocking to a person of ordinary conscience and unjustifiable under the circumstances, including the respectful demeanor displayed by Hall even has he was upset and frightened prior to the officer's deployment of force against him, the complete lack of unlawful, violent, or threatening conduct on his part, and his communication of an injury upon seizure and a lack of ability to move freely

making his compliance with Tanner's orders impossible without a mobility assisting device. The amount of force used to accomplish the detention was without probable cause or reasonable need, and was clearly excessive and objectively unreasonable.

65.     By his actions asserted herein that initiated the unlawful seizure, Defendant Tanner was acting under color of law in his capacity as a police officer, and but for that authority Hall would not have been subject to excessive force as alleged herein. Had Defendant Tanner taken notice of mobility aids, the words of both Mr. Hall and Ms. Smith, and the pleas for release from Mr. Hall, he could have avoided the use of excessive force.

66.     A reasonable officer in the position of Defendant Tanner would not have initiated any such use of force against Mr. Hall and a reasonable officer in the position of Defendant Bays would not have failed to intervene in an unlawful arrest and deployment of excessive force, and, moreover, would have recognized the arrest as unlawful and the use of force as excessive. Defendant Bays acted under color of state law in failing to so intervene and but for that authority Hall would not have been subject to excessive force as alleged herein.

67.     By their actions alleged herein, all taken under color of law, Defendants Tanner and Bays deprived Hall of his right to freedom from excessive force that is secured to him by the Fourth Amendment and was clearly established as of September 11, 2023. All of these actions caused damage to Hall.

68.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Mr. Hall's rights, Hall has suffered and will continue to suffer economic and non-economic damages for which Defendants Tanner and Bays are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Hall is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 3**
**Violation of Right to Access Courts/Retaliatory Prosecution**
**First Amendment and 42 U.S.C. § 1983**
**(against Defendants Tanner, Bays, and Slone )**

69.    Plaintiff incorporates the previous allegations by reference.

70.    This Count 3 is alleged against Defendants Tanner, Bays, and Slone individually, in their

personal capacities.

71.    "The filing of a lawsuit to redress grievances is clearly protected activity under the First

Amendment." *Eckerman v. Tennessee Dept. of Safety*, 636 F.3d 202, 208 (6th Cir.2010). The First

Amendment also clearly protects a citizen's "entitle[ment] to speak as they please on matters vital to

them." *Wood v. Georgia*, 370 U.S. 375, 389, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).

72.    Defendants Tanner, Bays, and Slone knew, as of September 11, 2023, that Mr. Hall had been

subject to a needless and deplorable use of force as a result of the unconstitutional actions of

Defendants Bays and Tanner as alleged above. They also knew that Mr. Hall had a right to file a

lawsuit under 42 U.S.C. § 1983 to redress the harm caused by this egregious and patently

unconstitutional conduct, and they knew, based on Hall's own direct statements to them and effort

to report his attack, that he intended to vindicate those rights. Additionally, these Defendants knew,

pursuant to a custom, policy, and practice adopted, permitted, and supported by the City of Canton,

that Hall would be substantially hampered, if not outright prevented, from filing such a lawsuit if he

were subject to a baseless criminal prosecution that would put pressure on him to plead to a minor

misdemeanor, or otherwise sign an agreement not to sue in connection with these events. Under the

long-established doctrine announced by the U.S. *Heck v. Humphrey*, 512 U.S. 477 (1994), of which

these state officers were well aware, any such plea, even to a minor misdemeanor, would effectively

bar Hall from filing a lawsuit to redress his grievances over these unconstitutional events.

73.     Thus, in an effort to insulate the City and themselves from liability, these Defendants conspired to pursue the baseless and malicious prosecution against Mr. Hall for the purpose of negating his right and retaliating against his expressed intent to file suit on his constitutional claims. In so doing, Defendants conspired to concoct a fabricated narrative, laden with false statements, and dependent on Defendant Tanner's deliberate ignorance of his body camera footage, Defendant Bays' continued silence about Tanner's unlawful and unconstitutional arrest, and Slone's determination based on his own bias that Hall was lying, all of which conclusively demonstrate Hall's innocence of these malicious charges, the lack of probable cause behind them, and Defendants' own liability to Hall for having violated his civil rights.

74.     Defendants' institution of a malicious and baseless prosecution, based on a coordinated conspiracy and coordinated lies by a group of governmental officials, including police officers and prosecutors, constitutes an adverse action that would deter a person of ordinary firmness from exercising their First Amendment right to file lawsuits to redress grievances. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

75.     By their actions alleged herein, all taken under color of law or in conspiracy with those acting under color of law, Defendants Bays, Slone, and Tanner deprived Hall of his right to freely access courts to redress grievances that is secured to him by the First Amendment and was clearly established as of September 11, 2023. All of these actions caused damage to Hall.

76.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Mr. Hall's rights, he has suffered and will continue to suffer economic and non-economic damages for which Defendants Tanner, Bays, and Slone are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Hall is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 4**
**Malicious prosecution**

**Fourth Amendment and 42 U.S.C. § 1983**
**(against Defendants Tanner, Bays, and Slone)**

77.     Plaintiff incorporates the previous allegations by reference.

78.     This Count 4 is alleged against Defendants Tanner, Bays, and Slone individually, in their personal capacities.

79.     With purpose and intent, and acting under color of law or in conspiracy with those acting under color of law, Defendants engineered the baseless and malicious prosecution against Mr. Hall knowingly and without probable cause, with the intent to deprive him of his liberty interests secured to him by the Fourth Amendment of the U.S. Constitution. These actions include those alleged herein whereby Defendants conspired to concoct a fabricated and falsified narrative, laden with false statements and unexamined assumptions, by which to conceal the lack of probable cause behind the charges, and Defendants' own liability to Hall for having violated his civil rights.

80.     By their actions alleged herein, Defendants Tanner, Bays, and Slone, taken under color of law or in conspiracy with each other under color of law, they deprived Hall of his right to be free from malicious and baseless prosecution that is secured to him by the Fourth Amendment and clearly established as of September 11, 2023. *King v. Harwood*, 852 F.3d 568, 582-583 (6th Cir.2017). All of these actions caused damage to Hall, including restraint of his liberty in being subject to the baseless criminal prosecution, and time spent preparing for and sitting through an unnecessary and illegal trial, including also his injuries from Tanner's and Bays' excessive force at arrest.

81.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Mr. Hall's rights, Hall has suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Hall is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 5**

**Violation of First Amendment Right to Access Courts/Retaliatory Prosecution**
**Custom, Policy, and Practice**
**42 U.S.C. § 1983 and *Monell,* 436 U.S. 658.**
**(against Defendant City of Canton and Chief Gabbard)**

82.    Plaintiff incorporates the previous allegations by reference, and in particular the allegations set forth in Count 3 above.

83.    This Count 5 is alleged against Defendants City of Canton and Chief Gabbard, who together order, permit, tolerate, conspire to ensure, and are deliberately indifferent to the pattern and practice of First Amendment violative and retaliatory conduct set forth in Count 3 above.

84.    By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom of trumping up baseless criminal charges against victims of police misconduct—such as for assault, resisting arrest, or disorderly conduct—to insulate themselves and their officers from liability, knowing that the average citizen will be less likely to stand a criminal trial to retain the right to pursue their civil claims., Defendant City of Canton and Defendant Gabbard deprived Mr. Hall of fundamental First Amendment protected freedoms, rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

85.    This pattern is evidenced by the egregious behavior of the Defendants in this lawsuit, particularly in falsifying statements against Hall, and maintaining prosecution relying upon such false statements as evidence despite its clear inaccuracy.

86.    This pattern is further evidenced by the City Law Department's absurd actions in continuing to pursue the charges against Hall even in the face of clear evidence that no probable cause existed or could have existed to charge Mr. Hall for either of the crimes which he was forced to stand trial to defend against.

87.    This pattern is also evidenced by recent instances of similar (and in some cases similarly egregious) conduct involving City of Canton officers, some of which are easily identified by basic internet searches—, *see, e.g., Conver, et al. v. City of Canton, et al.,* N.D. Ohio No. 5:25-cv-00866-JPC

("the City of Canton writes a new page in the history books, as it permits the unreasonable use of police dogs in bad faith and/or in a wanton and reckless manner to rip into the bodies of defenseless citizens during their arrests" and "the Supervisory Defendants identified below knew or reasonably should have known of, participated in, endorsed, condoned, and/or ratified the unconstitutional conduct of their subordinates"); *and Jackson v. City of Canton, et al.* (including as a defendant the very same Defendant Bays, who observed the unlawful arrest of Mr. Hall in the instant matter and took no action, for observing another unlawful arrest and taking no action), N.D. Ohio No. 5:24-cv-00740-BYP (alleging arrest of Plaintiff due to "using vulgar language. There are families here" and charging her with disorderly conduct for speech acts).

88.     And this pattern is yet further evidenced by the perverse incentives to engage in such misconduct that are created by the *Heck* doctrine itself, as recognized by federal courts that have been exposed to their more egregious manifestations. *See, e.g., Taylor v. Cty. of Pima*, D.Ariz. No. CV-15-00152-TUC-RM, 2017 U.S. Dist. LEXIS 228241, at *14-15 (June 6, 2017) ("The Court shares Plaintiff's concern that *Heck* and its progeny may have unintentionally created a financial incentive for prosecutors to require convicted defendants asserting actual innocence claims to enter no-contest pleas in exchange for immediate release from confinement. ... If the Pima County Attorney's Office required Plaintiff to accept a no-contest plea for the purpose of creating a *Heck* bar to § 1983 liability, the Court is concerned that such conduct undermines the fairness and integrity of the justice system."). *See also* American Bar Association Resolution February 6, 2017, https://www.americanbar.org/content/dam/aba/directories/policy/midyear-2017/2017-midyear-112b.pdf ("When the prosecutor's office supports a defendant's motion to vacate a conviction based on the office's doubts about the defendant's guilt of the crime for which the defendant was convicted, or about the lawfulness of the defendant's conviction, the office should not condition its support for the motion on an Alford plea, a guilty plea, or a no contest plea by the defendant to the

original or any other charge. ... Besides raising serious public policy concerns, the practice is also unfair to the individual defendant. Guilty pleas, no contest pleas, and Alford pleas . . . complicates, if not eliminates, their ability to file a claim seeking compensation under state and federal law."); Caroline H. Reinwald, "A Deal with the Devil: Reevaluating Plea Bargains Offered to the Wrongfully Convicted," 99 N.C.L. Rev. Forum 139, 141 (2021), https://northcarolinalawreview.org/reinwald_finalforprint-2/ (discussing perverse incentives created by *Heck* doctrine and subsequent cases demonstrating egregious manifestations of same).

89.     As a direct and proximate result of this unlawful and unconstitutional conduct, which was intentional and showed a wanton disregard for Jon Hall's rights, Hall has suffered and will continue to suffer economic and non-economic damages for which the City and Chief Gabbard are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Hall is also entitled to punitive damages based on this unlawful and unconstitutional conduct. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

### Count 6
### Malicious Prosecution under Ohio law
### (against Defendants Tanner, Bays, and Slone)

90.     Plaintiff incorporates the previous allegations by reference.

91.     This Count 6 is alleged against Defendants Tanner, Bays, and Slone individually, in their personal capacities.

92.     The allegations set forth herein, if proven, establish Mr. Hall's right to recover against these Defendants on a claim for malicious prosecution under Ohio law.

93.     Probable cause did not exist to support the prosecution because the charges relied solely upon the false statements and unlawful conduct by the Defendants, and the proceedings would have never been instituted in the first place were it not for Defendants' false and intentionally misleading statements.

94. Defendants' conduct, which was intentional, retaliatory, taken in the spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, which Defendants knew had a great probability of causing, and which did cause Plaintiff to suffer substantial economic and non-economic harm, including, without limitation, mental anguish and emotional pain and suffering, attorney fees incurred in defending against the wrongful felony indictment, lost wages, and other economic losses.

### VI. Prayer for Relief

Wherefore, Plaintiff Jon Hall prays for judgment against Defendants in an amount in excess of $75,000.00 together with punitive damages, attorneys' fees, costs, expenses, and any other relief to which the Plaintiff may be entitled or that the Court deems equitable and just.

### VII. Jury Demand

Plaintiff demands a trial by jury on all issues within the Complaint.

Respectfully Submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
    peter@pattakoslaw.com
Gregory Gipson (0089340)
    ggipson@pattakoslaw.com
Zoran Balac (0100501)
    zbalac@pattakoslaw.com
Maryam Assar (0104229)
    massar@pattakoslaw.com

THE PATTAKOS LAW FIRM LLC
101 Ghent Road
Fairlawn Ohio 44333
P: 330.836.8533/F: 330.836.8536

*Attorneys for Plaintiff Jon Henry Hall*